Slip Op 08 - 18

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| DIAMOND SAWBLADES MANUFACTURERS COALITION, | : |
| Plaintiff, | : |
| v. | : |
| UNITED STATES, | : |
| Defendant, | : |
| and | : |
| ST. GOBAIN ABRASIVES, INC., EHWA DIAMOND INDUSTRIAL CO., LTD., and SHINHAN DIAMOND INDUS. CO., LTD., | : |
| Defendant-Intervenors. | : |

Before: **MUSGRAVE, Senior Judge**
Court No. 06-00247

**PUBLIC VERSION**

[Remanded to the U.S. International Trade Commission for further consideration.]

Dated: February 6, 2008

### OPINION AND ORDER

*Wiley, Rein & Fielding, LLP* (*Daniel B. Pickard*), for the plaintiff.

*James M. Lyons*, General Counsel, *Neal J. Reynolds*, Assistant General Counsel, Office of the General Counsel, U.S. International Trade Commission (*Charles A. St. Charles*) for the defendant.

*Akin Gump Strauss Hauer & Feld LLP* (*Jarrod M. Goldfeder* and *Lisa W. Ross*), for the defendant-intervenors Ehwa Diamond Industrial Co., Ltd. and Shinhan Diamond Industrial Co., Ltd.

*Thompson Hine LLP* (*Lynn M. Fischer Fox*), for the defendant-intervenor Saint-Gobain Abrasives, Inc.

Plaintiff Diamond Sawblades' Manufacturer's Coalition ("DSMC") moves for judgment on the agency record pursuant to USCIT Rule 56.2. The plaintiff challenges a determination by the U.S. International Trade Commission ("ITC" or "the Commission") that the domestic industry is not materially injured or threatened with material injury by reason of the subject imports. *See Diamond Sawblades and Parts Thereof from China and Korea*, Investigation Nos. 731-TA-1092 and 1093 (Final), USITC Publication 3862 (July 2006) Pub. R. Doc. 249 ("*Final Determination*"); *see also* 71 Fed. Reg. 39128 (July 11, 2006). The plaintiff argues that the ITC's determination is not supported by substantial evidence and otherwise not in accordance with law; the ITC opposes the plaintiff's motion. Defendant-Intervenors St. Gobain Abrasives, Inc., Ehwa Diamond Industrial Co., Ltd., and Shinhan Diamond Indus. Co., Ltd. have joined to urge that the ITC's determination be sustained. For the reasons stated below, the court will remand the matter to the Commission for further proceedings consistent with this opinion.

### Background

On May 3, 2005, DSMC filed a petition with the Commission alleging material injury to domestic producers of diamond sawblades and parts thereof due to imports from the People's Republic of China ("China") and Korea. *See Diamond Sawblades and Parts Thereof from China and Korea*, 70 Fed. Reg. 24612 (ITC May 12, 2005) (notice of institution of antidumping duty investigations and scheduling of preliminary phase investigations). The Commission issued a preliminary injury determination in August 2005, finding by a 6 to 0 vote that imports from China and Korea materially injured, or threatened to materially injure, the U.S. diamond sawblade industry. *See Diamond Sawblades and Parts Thereof from China and Korea*, Investigation Nos. 731-TA-1092

and 1093 (Preliminary) USITC Publication 3791 (August 2005) Pub. R. Doc. 96 ("*Preliminary*

*Determination*").

In July 2006, the ITC issued a final determination pursuant to Section 735(b) of the Tariff

Act of 1930, 19 U.S.C. § 1673d(b). The Commission, by a vote of 4 to 2, found that the domestic

industry was not materially injured or threatened with material injury by reason of the cumulated

subject imports from China and Korea. *Final Determination* at 24. The ITC found that although

subject imports were entering the United States in significant volumes and significantly undersold

the domestic like product, there was "no causal nexus between the subject imports and the condition

of the domestic industry." *Id.* at 29, 31, 36. The two dissenting commissioners agreed that the

domestic industry is not currently materially injured by reason of the subject imports from China and

Korea; however, contrary to the majority opinion, the dissent found that the domestic industry was

threatened with material injury by reason of the subject imports. *Id.* at 41.

### Summary of Relevant Findings

Diamond sawblades are circular cutting tools used to cut materials such as cement, marble,

brick, tile, and stone. They typically range in size from 4- 70" in diameter, with sawblades in the 10-

14" category considered to be in the "mid-range" size. *ITC Staff Report*, Pub. R. Doc. 249 at I-6.

Diamond sawblades have an inner steel core and a diamond-impregnated outer rim or cutting

surface. Depending on the application, the cutting surface can either be segmented or continuous,

and different manufacturing processes (*i.e.*, sintering, soldering, laser welding, braising) are used to

attach the diamond segment to the metal core. *Id.*

Although the *ITC Staff Report* indicated that "U.S. producers and importers offer thousands

of different diamond sawblades," the Commission determined that "diamond sawblades and parts

thereof" constituted a single domestic like product. *Final Determination* at 6, *ITC Staff Report* at II-5. The Commission also found that there was "a reasonable overlap of competition" among the subject imports from China and Korea and the domestic like product such that a cumulative assessment of volume and price effects of the subject imports was appropriate.[1] *Final Determination* at 20.

The domestic industry lost market share during the Period of Investigation ("POI") (from 2003 to 2005) in terms of both quantity and value. By value, the domestic industry's market share for finished diamond sawblades fell from [    ] % in 2003 to [    ]% in 2005. Manufacturers of sawblade components also lost market share, but to a lesser extent. *Final Determination* (Confidential version) Doc. 549 (List 2) at 26-27. Aggregate operating income of the domestic industry fell a total of [    ] % during the POI, as did the domestic industry's aggregate operating income margins (falling [   ]%) and aggregate return on assets (falling [   ]%). However, the ITC noted that cashflow increased slightly and that the domestic industry was not prevented from making significant capital expenditures during the POI. *Id.* at 37. In the end, the ITC concluded that "even after these modest declines, the domestic industry has remained highly profitable." *Final Determination* at 35.

Subject imports from China and Korea increased market share during the POI, both in terms of quantity and value. By value, subject imports' market share increased from 27.7% in 2003 to 40.0% in 2005; on quantity basis market share was 61.2% in 2003, increasing to 75.1% in 2005. As

---

[1] The Commission noted that although the product differences in diamond sawblades had "important implications for our assessment of causation," the general overlap in competition was sufficient to warrant cumulation. *Final Determination* at 22.

to sawblade components, subject imports market share was mixed, gaining for cores, losing for segments. *Id.* at 25-27.

Overall demand for finished sawblades and sawblade components increased during the POI. *Id.* at 24. By quantity, U.S. consumption of finished sawblades increased from 4.5 million units in 2003 to 6.8 million units in 2005; by value, U.S. consumption of finished sawblades increased from $187.4 million in 2003 to $214.9 million in 2005. *Id.* Demand for diamond sawblades is derived from the demand for construction projects involving the cutting of various aggregates. During the POI, the Commission noted that there were differences in the trends for consumption of diamond sawblades by diameter: Consumption of 7-10" diameter sawblades experienced the highest rate of growth during the POI (30.7%), whereas consumption of midrange (10-14" diameter) blades increased 18.6%, and large blades (14" diameter and larger) increased by 12.4%. *Id.*

The Commission found these demand patterns to be relevant in explaining the lack of competitive overlap between the subject imports and the domestic product. The ITC determined that the market focus of the subject imports had been the demand for smaller diameter, general use sawblades, which saw significant growth due to residential and home improvements construction, whereas the market focus of U.S. producers had been the demand for larger diameter, professional-use sawblades used in non-residential construction (*i.e.*, road, infrastructure, and office building) which saw "relatively flat" growth during the POI. *Id.* at 38.

1. General Market Segmentation: "Professional Use" vs. "General Use"

In finding that the subject imports focused on different market segments than those served by the domestic industry, the ITC determined that the diamond sawblade industry appeared to be

segregated into a substantial number of noncompetitive market segments.  Broadly speaking, however, diamond sawblades could be divided into the two categories of "professional use" and "general use." *ITC Staff Report* at I-10. "Professional use" sawblades are (1) sold to end users in the road and commercial construction industry; (2) largely segmented blades that are greater than 14"; and (3) "typically custom engineered for the industry." *Id.* at I-11. "General use" blades however, are "produced for contractors and [do-it-yourself ("DIY")] end users."  End users in this category would include "masons, concrete contractors, hardscape contractors[2], plumbing contractors," and the like, as well as, presumably, the DIY user who purchases the blade from a "big box" retailer such as Lowes or Home Depot.  The Commission's staff report did not provide a precise definition of "general use" sawblades but indicated that such would include "segmented and continuous rim blades with diameters of 14 inches or less but the range may extend up to 20 inches." *Id*. at I-12.

As noted above, the ITC found that sales to the established "professional" market had been dominated by the domestic industry and sales to the expanding "general use/DIY market" were dominated by the subject imports.  The ITC found that the foreign producers had been unable to make inroads into the professional use market due to high demand for customer service and highly customized sawblades in the professional industry. *Final Determination* at 37.  Additional evidence suggested that the domestic industry was likewise prevented from making inroads into the small-blade market because they did not produce lower-cost sintered blades.  Hearing Transcript ("Tr."), Pub. Doc. 179 at 88-89, 242-52.  The ITC concluded essentially that, try as they might, neither foreign not domestic producers had been able to make much of an inroad into the others' "turf"

---

[2]  "Hardscape" commonly refers to the portion of a building's grounds that consists of parking lots, patios, retaining walls, or walkways.

during the POI, and therefore found competition "limited" between subject and domestic diamond sawblade sales. *See Final Determination* at 36-38.

However, the Commission ultimately declined to adopt the "professional" vs. "general use" market segmentation analysis (which was advocated by the Respondents). The Commission noted that "within the finished diamond sawblade industry, there is no consensus as to which diamond sawblades categorically serve a particular ["general use" or "professional"] market." *ITC Staff Report* at I-10. Hence, the Commission proceeded to a more detailed (and more measurable) market segmentation analysis that examined the apparent components used to describe "professional" or "general use": blade size, manufacturing process, and channels of distribution/end user.

2. In-Depth Market Segmentation Analysis

a. Market Segmentation Based on Physical Attribute

The Commission determined that diamond sawblades may be categorized by (1) "the physical attributes of the finished blade" ("blade type"); (2) "the physical attributes of the diamond section"; and (3) "the method of joining the core to the diamond segments" ("manufacturing process"). *Id.* at I-6. "Blade type" refers to whether the blade cutting surface is segmented or continuous, which may dictate the application for which the blade is used. *Id.* The attributes of the diamond section relate to the concentration, quality, and size of the diamonds as well as the bond matrix that attaches the diamonds to the blade. *Id.* at I-9. Manufacturing process refers to the process (sintering, soldering, laser welding, braising) by which the diamond segments are attached to the metal core. *Id.* at I-5. Diamond sawblades that have segments laser welded to the core are noted to be stronger, have fewer failure rates, and are more reliable than sintered sawblades. *Id.* at I-9.

The Commission found that differences in blade type and manufacturing process played an important role in limiting competition because the subject imports were concentrated in blade types and manufacturing processes not widely produced by the domestic industry. For example, although the majority of both domestically produced and subject-import sawblades were "laser-welded segmented product," a "significant" percentage (31.4%) of Chinese and (27.6%) Korean sales during the POI consisted of sintered or continuous rim sawblades, which are almost nonexistent in the domestic industry (less than 1% of sales). *Final Determination* at 21. Likewise, the ITC found that a "significant" percentage (15%) of the domestic industry's sales consisted of soldered or braised segmented products, where the subject imports had very little presence. *Id*.

### b. Market Segmentation Based Blade Diameter

The ITC also determined to segment the diamond sawblades market by blade diameter because different size sawblades are used in different applications and on different types of cutting equipment. *See id.* at 28; *Confidential Staff Report,* Doc. 441(List 2) at II-48–II-50 (indicating that sawblades of different diameters are generally not interchangeable).

 The ITC found attenuated competition in terms of blade diameter, noting that "nearly half" of U.S. shipments were in sizes 14" and larger, whereas only 7% of the imports from China and 14% of the imports from Korea were in that size range. *Final Determination* at 27. The ITC concluded, "[t]his indicates that, based on size considerations alone, the majority of domestic shipments of finished U.S. diamond sawblades were in sizes in which the subject imports had a relatively small presence." *Id*. Further, nearly half of subject imports' U.S. shipment value was for sawblades less than 10" in diameter (50.2% from China, 44.4% from Korea) while only 6.3% of U.S. product

shipments were for that size range, so "a very substantial portion of subject imports were shipped in sizes in which the domestic product's presence was relatively small." *Id.* at 28-29.

### c. Market Segmentation Based on Channels of Distribution

The ITC also found segmentation appropriate based on differences in the channels of distribution. *Id.* at 25. The Commission's first compilation of data indicates that the majority of all U.S., Chinese, and Korean sawblades are sold in the "distributors" channel of distribution. *See ITC Staff Report* at Table I-3.

However, the ITC further segmented the "distributors" category into two subcategories: "branded distributors" and "nonbranded distributors." The ITC explained that "branded" distributors purchased/sold diamond sawblades under their own names while "other" distributors sold only diamond sawblades under suppliers' names. *Final Determination* at 22 n.157. In its analysis of certain purchaser questionnaire responses, the ITC determined that there were differences in the market focus of these distributors, and concluded that different distributors served different end users. For example, the Commission found that "branded" distributors sold a wider range of small-diameter sawblades, a smaller range of large-diameter products, and a broader range of different sawblade types, to both end users and retailers, and that "other" (*i.e.*, non-branded) distributors were more likely to buy large-diameter merchandise and sell them only to end-users. *Id.* at 27-28, n.193. Producer and importer questionnaire responses also indicated differences with respect to the types of contractors that purchased sawblades from branded versus other distributors. *Id.*

The ITC determined that U.S. producer shipments were made primarily to the "other distributor" (36.1%) and "end user" (including professional construction firms) (46.2%) distribution

channel(s) and that these two distribution channels predominantly served professional construction users of diamond sawblades for nonresidential construction activities, *e.g.*, road construction and infrastructure projects. *Id*. at 23-24. By contrast, Chinese and Korean sales were directed primarily to "branded" distributors (47.9% and 44.8% , respectively) and original equipment manufacturers (18.1% and 27.9%, respectively). *Id*.

Based on these findings, the ITC concluded that

> even when subject imports and U.S.-produced finished diamond sawblades are sold in similar size ranges, the end users to which the blades are sold generally differ, with the majority of subject diamond sawblade imports sold to branded distributors and the majority of the domestically-produced sawblades sold to other distributors. Accordingly, competition between the subject imports and the domestic like product is limited, largely by reason of differences in the mixes of blade diameters and customers.

*Final Determination* at 27-28 (footnote omitted).

### Jurisdiction and Standard of Review

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2000). The court will examine the ITC's final negative determination in an antidumping duty investigation to determine whether it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (2000).

Under 19 U.S.C. § 1677f(i)(3)(B), the Commission is directed to "include in a final determination of injury an explanation of the basis for its determination that addresses relevant arguments that are made by interested parties who are parties to the investigation or review (as the case may be) concerning volume, price effects, and impact on the industry of imports of the subject merchandise." 19 U.S.C. § 1677f(i)(3)(B) (2000). *Cf. United States v. Nova Scotia Food Prods.,* 568 F.2d 240, 252 (2d Cir. 1977) (holding that "[i]t is not in keeping with the rational [agency]

process to leave vital questions, raised by comments which are of cogent materiality, completely unanswered.").

In its review of ITC's determination, the Court must consider whether the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).

For purposes of determining the degree of harm to a domestic industry from dumping, "material injury" is "harm which is not inconsequential, immaterial, or unimportant." 19 U.S.C. § 1677(7)(A) (2000). To make that determination, the ITC is directed to consider the volume, the effect on prices in the U.S. for domestic like product, and the impact of subject merchandise as well as other "relevant economic factors . . . and conditions of competition that are distinctive to the affected industry." 19 U.S.C. § 1677(7)(C)(iii)(2000).

### *Discussion*

### A. Limited Competition Finding

The principal point of controversy with respect to the negative material injury determination concerns the Commission's finding of attenuated competition. DSMC's argues that the findings of limited competition based on blade size and based on channels of distribution are erroneous and unsupported by substantial evidence of record. DSMC states that the finding of limited competition by blade size is contradicted by evidence showing that the domestic industry and the subject importers both sold the greatest number of sawblades in the 12-14" range. Pl.'s Reply Br. at 4. DSMC argues further that the *Final Determination* contains a material misstatement in this regard because there the ITC stated that the greatest degree of competitive overlap was in the 10-12"

diameter range, when the data clearly showed that the greatest degree of competitive overlap was actually in the 12-14" range. *Id*. DSMC contends that a material error of this nature requires remand.

As to channels of distribution, Plaintiff contends that the ITC's findings as to the existence and importance of "distinct" channels of distribution are inconsistent with the facts of record, and that both branded and non-branded distributors sold to the same customer base, primarily general contractors. Pl.'s Br. at 8-10; *see Final Determination* at 44 (dissent); Confidential Doc. 549 at 46 n.29.

The Commission asserts that it reasonably found that competition was limited during the POI and that the *Final Determination* should be affirmed. Def.'s Br. at 1. As to the plaintiff's material misstatement argument, the Commission admits that the reference to 10-12" sawblades in the *Final Determination* was a misstatement, but contends that it was a harmless drafting mistake. The Commission notes that the data contained in the *Final Determination* shows that the greatest percentage of competitive overlap was in the 12-14" diameter range, and that ITC "obviously" understood the degrees of overlap within the respective 12-14" and 10-12" diameter categories. *Id*. at 17. As to channels of distribution, the ITC responds that it properly segmented those channels and that the data supported a conclusion of limited competition. *Id*. at 19-20.

The Commission also notes that DSMC did not discuss the differences in the cutting edges of the sawblades (whether they are continuous or segmented) and the manner by which the cutting edges are attached to their core (whether by sintering, laser-welding, soldering or braising). *Id*. at 21-22. According to the ITC, these product type differences acted to further limit competition between the subject imports and the domestic products. *Id*. at 22.

1. Material Misstatement in ITC's Finding of Limited Competition

The court cannot agree that the ITC's misstatement regarding the 10-12" size range was material to its determination or that remand is required on this ground. "Where a subsidiary finding is unfounded, the court will remand the case . . . only if the court is in substantial doubt whether the administrative agency would have made the same ultimate finding with the erroneous finding removed from the picture." *U.S. Steel Corp. v. United States*, 18 CIT 1190,1215, 873 F.Supp. 673, 696 (1994) (quoting *Kurzon v. United States Postal Serv.*, 539 F.2d 788, 796 (1st Cir. 1976)).

Here, substantial evidence of record indicates that the ITC understood that the greatest competitive overlap was in the 12-14" range of sawblades, not the 10-12" range. *See Final Determination* at 27 n.193 (the "size range showing the most overlap between U.S.-produced and subject imported diamond sawblades" was "size range greater than 12" to 14" diameter"); *id.* at 22 (noting "overlap among the subject imports and the domestic like product in the 12-inch to 14-inch diameter range"); *see also Confidential Staff Report* at Tables I-1 & II-1, E-1–E-3). Further, the ITC's competition analysis in terms of blade diameter focused on the lack of competitive overlap in small-diameter (less than 10") and large-diameter (larger than 14") sawblades; because mid-range blades would include 12-14" blades, as well as 10-12" blades, such an error would not affect the Commission's competition finding. Accordingly, the court finds that ITC's misstatement was harmless error.

2. Finding Limited Competition Based on Sawblade Diameter

The court finds that the Commission's conclusion of attenuated competition based on sawblade diameter is not supported by substantial evidence of record. The Commission noted

correctly that (based on value) "nearly half" of the domestic sawblades were sold in sizes 14" and larger, as compared to only 7% of the subject imports, and that "nearly half of the subject imports" were blades of 10" or less, a size range that occupied only 6.3% of the domestic industry. However, this conclusion ignores the fact that the *other half* of domestic sawblades were sold in midrange (10-14") sizes, where, coincidentally, "nearly half" of the subject imports are also concentrated. This point is illustrated in the following table, found in the *ITC Staff Report*:

Table I-1--*Continued*
Diamond sawblades: U.S. producers' and importers' U.S. shipments, by blade diameter, 2003-05

| Item | ≤7.0" | >7.0" but ≤10.0" | >10.0" but ≤12.0" | >12.0" but ≤14.0" | >14.0" but ≤20.0" | >20.0" | Total |
|---|---|---|---|---|---|---|---|
| | Share of value (percent) | | | | | | |
| U.S. producers' commercial shipments: | | | | | | | |
| 2003 | 4.0 | 2.5 | 10.8 | 35.7 | 13.0 | 29.1 | 100.0 |
| 2004 | 3.9 | 2.5 | 10.5 | 34.0 | 20.2 | 28.3 | 100.0 |
| 2005 | 3.8 | 2.3 | 9.1 | 34.3 | 21.0 | 29.6 | 100.0 |
| U.S. commercial shipments of imports from China: | | | | | | | |
| 2003 | 30.7 | 13.5 | 10.4 | 31.5 | 5.0 | 1.4 | 100.0 |
| 2004 | 37.1 | 13.5 | 8.9 | 34.0 | 4.9 | 1.4 | 100.0 |
| 2005 | 36.9 | 12.1 | 7.7 | 35.8 | 5.8 | 1.7 | 100.0 |
| U.S. commercial shipments of imports from Korea: | | | | | | | |
| 2003 | 30.6 | 15.5 | 10.3 | 28.1 | 11.0 | 3.5 | 100.0 |
| 2004 | 30.2 | 16.2 | 10.0 | 30.0 | 10.6 | 3.1 | 100.0 |
| 2005 | 28.0 | 14.9 | 10.8 | 34.1 | 10.9 | 3.4 | 100.0 |
| Subtotal, U.S. commercial shipments of subject imports: | | | | | | | |
| 2003 | 30.7 | 15.7 | 10.4 | 29.0 | 9.3 | 2.9 | 100.0 |
| 2004 | 32.0 | 15.3 | 9.6 | 31.2 | 9.3 | 2.5 | 100.0 |
| 2005 | 29.8 | 13.3 | 9.7 | 34.7 | 9.1 | 2.8 | 100.0 |

*ITC Staff Report* at I-8. Although the data contained in the above chart does support ITC's finding that "nearly half" of the domestic industry shipments were in sawblades of 14" or larger (specifically, 46.9% in 2003, 48.5% in 2004, and 50.6% in 2005) the data also indicate that an almost equal proportion of the U.S. industry was focused on so-called "midrange" sizes of 10-14" blades (specifically 46.5% in 2003, 45.1% in 2004, and 43.4% in 2005). As noted above, more subject

imports were concentrated in the two midrange categories than the two small-blade categories.  The ITC fails to offer an explanation as to how this data reflects attenuated competition based on blade size.

### 3.  Finding Limited Competition Based on Manufacturing Process

Similarly, ITC's finding of attenuated competition based on manufacturing process is unsupported by substantial evidence of record and cannot be sustained.  The ITC noted as significant the fact that "a significant portion of the subject imports are produced using a sintering process to join component parts, whereas very little sintering is used in the U.S. industry." *Final Determination* at 26.  Were the data to show that the subject imports used sintering uniformly across all blade sizes, this might show attenuated commpetition; however, this is not the case.  In fact, ITC's data indicate that the vast majority of sintered blades were confined to smaller diameter sawblades, where, as noted above, the domestic industry had little presence to begin with.  On the other hand, the data indicate that, in the midrange sawblades where most of the overlap occurred, the vast majority of the subject imports were not sintered, but laser-welded, just as U.S.-produced blades were.

**Table II-1**
**Diamond sawblades: Sizes and method of joining core and segment, by country, weighted averages, 2004**

| Source and method of joining core and segment | Diameter size | | | | | Total |
|---|---|---|---|---|---|---|
| | ≤7.0" | >7.0" but ≤10.0" | >10.0" but ≤14.0" | >14.0" but ≤20.0" | >20.0" | |
| | Share of value (in percent) | | | | | |
| **United States:** | | | | | | |
| Laser-welding | *** | *** | 40.0 | 14.4 | 16.6 | 79.4 |
| Soldering | *** | *** | 3.6 | 5.0 | 7.4 | 16.2 |
| Sintering | *** | *** | (1) | (1) | (1) | 4.4 |
| Total | 7.5 | 5.3 | 43.7 | 19.4 | 24.0 | 100.0 |
| **China:** | | | | | | |
| Laser-welding | *** | *** | 34.5 | 3.8 | 1.9 | 46.0 |
| Soldering | *** | *** | *** | *** | *** | 1.1 |
| Sintering | 28.7 | 11.2 | *** | *** | *** | 52.8 |
| Total | 33.4 | 13.2 | 41.8 | 4.2 | 7.5 | 100.0 |
| **Korea:** | | | | | | |
| Laser-welding | 7.7 | 9.9 | 24.2 | 8.1 | 2.3 | 52.1 |
| Soldering | (1) | (1) | 0.8 | *** | *** | 3.6 |
| Sintering | 17.6 | 9.7 | 16.8 | *** | *** | 44.3 |
| Total | 25.3 | 19.6 | 41.9 | 9.5 | 3.8 | 100.0 |

*Preliminary Determination* at II-3. As the table above indicates, sawblades between 10-14" in diameter are predominantly laser-welded, regardless of origin. Hence, the finding that sintered blades typically do not compete with the laser welded variety only underscores the lack of competition in smaller diameter blades by further differentiating the imported product from that manufactured by the domestic industry. The ITC offers no explanation as to how its data, which indicate that foreign and domestic sawblades in the midrange sizes are both laser welded and segmented, show attenuated competition.

### 4. Finding Limited Competition Based on Channels of Distribution

The court finds that the Commission has failed to explain adequately its conclusions regarding differences in channels of distribution. Although the data presented support a conclusion that (as indicated in the *ITC Staff Report,* Table I-3) the majority of all U.S., Chinese and Korean

sawblades are sold through "distributors," the Commission does not adequately explain its conclusion that "branded distributors" and "other distributors" served different end users.

Indeed, the *ITC Staff Report* and the *Final Determination* contain a paucity of evidence demonstrating that these distributors actually served different end users. Footnote 193 of the *Final Determination* indicates that branded distributors reportedly sold (1) "a larger range of smaller products" than nonbranded distributors; (2) "a smaller range of larger diameter products" than nonbranded distributors; and (3) a broader range of sawblade types (laser-welded segmented, sintered continuous-rim, soldered/brazed, etc.) than nonbranded distributors. *Final Determination* at 27, n.193. The Commission noted further that "the branded distributors sold to both end users and resellers, the latter, in turn, selling to end users, whereas the other distributors reported selling to only end users." Finally, the Commission observed that the various suppliers disagreed as to "what constitutes professional construction end users of sawblades" which suggests "differences in the types of contractors that the responding . . . distributors refer to as their customers." *Id.*

The court is unable to conclude that these observations explain adequately the Commission's rationale for finding a meaningful difference between "branded" and "nonbranded" distributors. The propensity of a distributor to sell "a larger range of smaller products" and fewer large-diameter sawblades, does not, by itself, offer any insight as to how sales to that distributor attenuates competition in regard to *midrange* blades. Likewise, the fact that these distributors sold "a broader range of sawblades types" is neither surprising nor enlightening; given that it is only the smaller blades that are almost exclusively of the sintered/continuous rim variety, distributors selling a large range of smaller products would necessarily end up with more sawblade types. The only data

presented by the Commission that provide a colorable argument for the notion that these distributors

may have served different customer types is the cryptic observation that distributors disagreed as to

"what constitutes professional construction end users of sawblades" which suggests "differences in

the types of contractors that the responding . . . distributors refer to as their customers."

Unfortunately, without a substantial amount of development and explanation, this comment confuses

the matter even more:  How can the ITC draw a conclusion as to who the "end user" is if the

suppliers themselves are unable to do so?  Moreover, the ITC offers no explanation as to why it

supports a finding as to who "distributors refer to as their customers" with a citation to "U.S.

*producer and importer* questionnaire responses." *Final Determination* at 28, n.193 (emphasis

added).  Accordingly, the court is unable to conclude that the Commission's explanation provided

"a rational connection between the facts found and the choice made," and remand is required.  *State

Farm*, 463 U.S. at 43.

## II. Price Effects Finding

### A.  Failure to Discuss Evidence and Arguments

DSMC asserts that the price effects finding is unsupported by record evidence and otherwise

not in accordance with law because the Commission failed to address material evidence and

arguments presented on the record that show the true extent of competition and price effects.  Pl.'s

Br. at 12.  Specifically, DSMC points to (1) evidence of "hundreds of pages of catalogues and offers

to sell in the United States" that allegedly demonstrated that Chinese and Korean producers sold

diamond sawblades directly competitive with those produced by the domestic industry; (2) evidence

regarding the closure of two domestic-like-product plants due to import competition; (3) domestic

producer testimony that subject imports compete head to head against the domestically produced product and caused significant harm (*see* Tr. at 165-66 (testimony of Mr. Wolters); *see also id.* at 20 (testimony of Mr. Garrison); 38-39 (testimony of Ms. O'Day)); and (4) testimony in regard to customers "switching" to Chinese and Korean products because of price (*id.* at 140 (testimony of Mr. Edmond)).

The court is not persuaded that the ITC's failure to discuss this evidence in the *Final Determination* was error. The Commission is not required to make written findings of all the evidence it considers. *Negev Phosphates, Ltd. v. U.S. Dep't of Commerce,* 12 CIT 1074, 1083, 699 F. Supp. 938, 947 (1988) (citation omitted). It is well established that "absent some showing to the contrary, the Commission is presumed to have considered all of the evidence in the record," and this is particularly true "where the facts allegedly ignored were presented to the Commission at a[n] open hearing." *National Ass'n of Mirror Mfrs. v. United States*, 12 CIT 771, 779, 696 F.Supp. 642, 648 (1988). Moreover, the plaintiff has failed to present any argument that the evidence to which it refers is so significant as to "seriously undermine" the ITC's reasoning and conclusions on the issue. *Cf. Altyx Inc., v. United States*, 25 CIT 1100, 1117-18, 167 F.Supp. 2d 1353, 1374 (2001) (holding that the ITC must address evidence that "seriously undermines its reasoning and conclusions").

### B. Failure to Investigate Lost Sales and Lost Revenue Allegations

Plaintiff contends that the ITC "impermissibly failed to investigate" "millions of dollars of lost sales and lost revenue allegations" that were submitted during the investigation. Pl.'s Br. at 27-28. Specifically, the plaintiff asserts that the ITC's rejection of several affidavits on the ground that they lacked specificity is not supported in the record and "a product of extremely arbitrary and capricious decision-making." *Id*. at 28. Plaintiff alleges that the information contained in the

rejected affidavits was "at least as detailed as that provided in other allegations" that the ITC chose

to confirm, and asserts that the Commission "had a duty to at least contact the customer named in

the allegations." *Id.* at 31.

The Commission argues that it had "ample reason" for not investigating the lost sales

allegations on the ground that they were incomplete. The Commission notes that, on more than one

occasion, it requested that the plaintiff submit specific information pertaining to "the name of the

customer . . . , the name of the specific product(s) covered by the allegation, the date of sale, the sales

quantity involved, the prices offered by the competing domestic and import suppliers, the final price

of the sale, and the country of origin." Def.'s Br. at 33-34. In spite of these requests, the plaintiff

never provided the information. *Id.* at 34.

Under the current posture of this case, the court cannot agree that the Commission's failure

to investigate the lost sales allegations constitutes a remandable error. This Court has noted on

several occasions, that "[t]he Commission has broad discretion to pursue an investigation in a

manner that will provide substantial evidence to support its determinations," and that "[t]here is no

minimum standard set by Congress to measure the thoroughness of an investigation by the

Commission." *U.S. Steel Group v. United States,* 18 CIT 1190, 1218, 873 F.Supp. 673, 698 (citing

*Granges Metallverken*, 13 CIT at 481, 716 F.Supp. at 25, and *Atlantic Sugar, Ltd. v. United States,*

744 F.2d 1556, 1561 (Fed. Cir.1984)).

However, the Commission is not without responsibility to procure relevant evidence of this

nature; there have been instances where the Court has remanded ITC determinations based on a

failure by the agency to investigate less-than-complete allegations of lost sales. *See, e.g., USX Corp.*

*v. United States*, 11 CIT 82, 655 F.Supp. 487 (1987). It is important to note, however, that the

remand in *USX Corp.* was not premised on ITC's duty to procure all reasonably available

information. Instead,

> [i]t was the Commission's sole reliance on the absence of confirmed
> allegations "in the face of steadily rising import volume and proven
> margins of underselling" that rendered the Commission's
> determination unsupported by substantial evidence without further
> investigation.

*Czestochowa (Stalexport) v. United States*, 11 CIT 758, 785-86, 890 F.Supp. 1053, 1075 (1995)

(quoting *USX Corp.*, 11 CIT at 86, 655 F. Supp. at 491). *Csestochowa*, *USX Corp.*, as well as

*Allegheny Ludlum Corp. v. United States*, 287 F.3d 1365 (Fed. Cir. 2002) indicate that although the

Commission "has broad discretion" in its pursuit of information for an investigation, the Court will

not uphold a determination that relies solely on the absence of information that the Commission

chose not to pursue. In this matter, the ITC is cautioned that the information contained in the lost

sales allegations may be of greater importance on remand, and that some investigation of the

incomplete allegations may then be appropriate.

## C. The ITC's Price-Effects Analysis

The Commission found that underselling by the subject imports was significant during the

POI, but that it did not have a significant effect on prices for the domestic product. *See Final*

*Determination* at 31 (noting that subject imports undersold the domestic product in 301 out of 360

observations by margins of up to 83.65 %). The Commission based this determination on, *inter alia*:

(1) a finding that, in many cases, domestic prices fell in conjunction with increased volume,

suggesting "price/volume tradeoffs that reflect a broad range of factors unrelated to subject imports";

(2) the importance of "non-price factors" indicated in questionnaire responses; and (3) data showing

that, in some cases domestic prices increased during the POI or decreased while subject import prices

rose or stayed the same.  As stated in the *Final Determination*, the Commission noted that

> [i]n 12 of 17 combinations in which U.S. producers' prices trended downward over the period, the downward prices were accompanied by increased volumes of the U.S. product over the period, suggesting price/volume tradeoffs unrelated to subject imports, including competition among domestic producers or demand conditions affecting only certain end users.

*Id.* at 31.  The Commission then found that, "given the limited competition between the subject imports and the domestic like product, subject imports have not had a significant role in the limited price suppression may have occurred."  *Id.* at 32.

Plaintiff argues that the ITC's price-trends analysis is unsupported by the substantial record evidence because the ITC's data does not contain the necessary information to show either that the volume increase compensated for the lower prices, or that the declines could be attributed to competition between domestic producers.

The court agrees to the extent that the ITC's analysis, without further elaboration, cannot reasonably be said to support the result reached.  In the common understanding of a price/volume tradeoff, the increased volume of sales must be sufficient to offset the reduced operating profit per unit.  That is, it is rather a price/volume/*profit* tradeoff.[3]  However, as the plaintiff correctly points out, the Commission's finding of a price/volume tradeoff appears to be devoid of any data indicating what the operating profit per unit was in each case.  In its brief, the ITC contends that "[s]ince the data do[] indicate . . . that the industry increased its sales volumes for the majority of products on which it lowered prices, and since increased sales volume is a positive indicator of the industry's

---

[3]  *See generally* Paul A. Samuelson, William D. Nordhaus, *Economics*, 137-40 (16th ed. 1998).

condition, the Commission reasonably found the industry made a 'price/volume tradeoff' for these products." Def.'s Br. at 31-32. Unfortunately, this explanation ignores completely the question of whether the volume increase was an adequate "tradeoff" for the lowered prices. Without further elucidation as to the Commission's definition of a "price/volume tradeoff," the court is unable to find that the ITC has provided a "reasoned explanation" for its finding in this regard. On remand, the Commission must provide a more thorough explanation for this finding, as well as an explanation as to how the purported price/volume tradeoffs would indicate competition among domestic producers.

To the extent that the Commission attributed the falling prices to competition among domestic producers, the Commission appears to have based this very significant finding upon the data referenced in a single footnote contained in the report.[4] *See Final Determination* at 31, n.224. The court cannot find that this single footnote, without further explanation, constitutes either "substantial evidence of record" or "a reasoned explanation" for the ITC's determination.

### III. Findings as to Volume, Impact, and Threat of Material Injury

Finally, DSMC contends that most of the Commission's findings must be remanded because they are based, at least in part, on its erroneous finding of attenuated competition. DSMC contends that, in light of that error, (1) the volume finding, (2) the price-effects determination, (3) the impact finding, and (4) the threat analysis all must be remanded because they are based in part upon the

---

[4]Although footnote 224 refers to "differences among quarterly weighted average prices among certain producers" as support for this assertion, the court notes that the section of the *ITC Staff Report* to which the note refers also states that price differences among domestic producers "may also result from differences in the grade/quality of the sawblades."

flawed limited competition finding and are otherwise unsupported by substantial evidence of record. Pl.'s Br. at 17, 19, 30, 33.

The court agrees with the plaintiff's assertion in this regard. The Commission appears to have relied, at least in part, on the attenuated-competition finding for each of the above-referenced determinations. *See Final Determination* at 30 (concluding that, given the finding of attenuated competition, the "significant volume has not had a significant impact on the prices or performance of the domestic producers."); *id.* at 35-36 (noting that "prevailing conditions of competition . . . indicated that the adverse effects of the subject imports is not significant."); *id.* at 36-37 (concluding that the domestic industry is not vulnerable because of strong demand and "limited overlap in direct competition" with the subject imports).

Because the Commission's findings rest, in part, upon "findings of subsidiary fact, or inferences therefrom" that the court deems unsupportable, the court is in "substantial doubt" whether the Commission "would have made the same ultimate finding with the erroneous findings removed from the picture." *U.S. Steel Corp.*, 18 CIT at 1215, 873 F.Supp. at 696. Accordingly, these issues must be remanded for reconsideration as well.[5]

---

[5] In light of the further development that may occur on remand, the Commission may revisit DSMC's related arguments concerning the existence of competition and threat of material injury.

### *Conclusion*

This matter is hereby remanded to the ITC for further consideration consistent with this opinion.  The ITC shall file its decision not later than April 4, 2008.  Plaintiff will have 15 days from the filing of the decision to respond.  Defendants may reply within 10 days thereafter.

**SO ORDERED.**


                                                    ___/s/____R. Kenton Musgrave_____
                                                    R.  KENTON MUSGRAVE, Senior Judge

Dated: February 6, 2008
          New York, New York

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.


Tina Potuto Kimble
Clerk of the Court


Date: _____     By: _____
                                              Deputy Clerk