Slip Op. 09 - 5

# UNITED STATES COURT OF INTERNATIONAL TRADE

```
                                    :
DIAMOND SAWBLADES                   :
MANUFACTURERS COALITION,            :
                                    :
                    Plaintiff,      :
                                    :
          v.                        :      Before: MUSGRAVE, Senior Judge
                                    :      Court No. 06-00247
UNITED STATES,                      :
                                    :      PUBLIC VERSION
                    Defendant,      :
                                    :
          and                       :
                                    :
ST. GOBAIN ABRASIVES, INC., EHWA    :
DIAMOND INDUSTRIAL CO., LTD., and   :
SHINHAN DIAMOND INDUS. CO., LTD.,   :
                                    :
          Defendant-Intervenors.    :
                                    :
```

## OPINION

[Sustaining the ITC's Remand Determination.]

Decided:  January 13, 2009

*Wiley, Rein & Fielding, LLP* (*Daniel B. Pickard*) for the plaintiff.

*James M. Lyons*, General Counsel, *Neal J. Reynolds*, Assistant General Counsel, Office of the General Counsel, U.S. International Trade Commission (*Charles A. St. Charles*) for the defendant.

*Akin Gump Strauss Hauer & Feld, LLP* (*J. David Park, Jarrod M. Goldfeder, Lisa W. Ross, Spencer S. Griffith*, and *Valerie A. Slater*) for the defendant-intervenors Ehwa Diamond Industrial Co., Ltd. and Shinhan Diamond Industrial Co., Ltd.

*Thompson Hine, LLP* (*Lynn M. Fischer Fox*) for the defendant-intervenor Saint-Gobain Abrasives, Inc.

This matter comes before the court as a result of the court's decision in *Diamond Sawblades Mfr's. Coalition v. United States*, Slip Op. 08-18 (Feb. 6, 2008).  In that case, the court remanded a decision of the U.S. International Trade Commission ("Commission" or "ITC") that determined the domestic diamond sawblade industry was neither materially injured nor threatened with material injury by reason of subject imports from China and Korea.  *See Diamond Sawblades*, Slip Op. 08-18; *Diamond Sawblades and Parts Thereof from China and Korea*, Investigation Nos. 731-TA-1092 and 1093 (Final), USITC Publication 3862 (July 2006) Public R. Doc. 249 ("*Original Determination*"). In its opinion, the court found that the ITC had failed to provide an adequate explanation or substantial evidentiary support for certain ITC findings relating to the degree of competition between subject imports and the domestic product; the court remanded the matter and instructed the Commission to reconsider and explain more fully its negative-injury determination in light of the court's findings.  *Diamond Sawblades*, Slip Op. 08-18.  In the determination issued pursuant to the court's remand, the Commission affirmed its negative finding as to present material injury, but reversed its position on threat of material injury (rendering an affirmative finding by a vote of 3-3). *Diamond Sawblades and Parts Thereof from China and Korea*, Investigation Nos. 731-TA-1092 and 1093 (Final) (Remand), USITC Pub. 4007 (May 2008) Public R. Doc. 305R ("*Remand Determination*").  Defendant-Intervenors Saint-Gobain Abrasives, Inc. ("St. Gobain") Ehwa Diamond Industrial Co., Ltd. ("Ehwa") and Shinhan Diamond Industrial Co., Ltd. ("Shinhan") (*hereinafter* collectively "Respondents") assert that the Remand Determination is contrary to law and urge the court to reverse the ITC's decision or to remand the matter for further consideration.  The Commission, joined with Plaintiff Diamond Sawblades Manufacturer's Coalition ("DSMC"), argues

that the decision should be sustained.  This court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2000).  For the reasons set forth below, the court will sustain the Remand Determination.

## I. Background

The facts of this case were extensively summarized in the court's previous opinion on this matter and need not be fully repeated here.  *See Diamond Sawblades*, Slip Op 08-18 at 2-10.  In July 2006, the Commission determined, by a 4-2 vote, that an industry in the United States was not materially injured or threatened with material injury by reason of imports of diamond sawblades or parts thereof from China and Korea.  *Original Determination* at 3.  The Commission found that although subject imports were entering the United States in significant volumes, had increased market share, and significantly undersold the domestic like product, there was "no causal nexus between the subject imports and the condition of the domestic industry," because competition between the domestic product and subject imports was limited.  *Original Determination* at 29, 31, 36.  Specifically, the Commission found that "[c]ompetition between the subject imports and the domestic product [was] limited by differences in the type of end user to which sales [we]re made, the diameters of the blades sold, and the differences in blade type and the manufacturing process." *Original Determination* at 28.

The court remanded the Original Determination upon finding, *inter alia*, that the Commission's finding of limited competition lacked substantial evidentiary support.  The court specifically found that (1) the limited-competition finding could not be explained by differences in sawblade diameter because record data showed heavy competition in the midrange (10-14") diameter blades, where half of all sales (by revenue) were concentrated; (2) the limited-competition finding

could not be explained by differences in blade type and manufacturing process because the substantial majority of midrange sawblades were of the same type (segmented) and manufactured with the same process (laser welding); and (3) the Commission had failed to adequately explain its finding that "branded" and "nonbranded" distributors did not compete when evidence showed that both distributor types served the same end user. *Diamond Sawblades*, Slip Op. at 16-18.

On remand, the Commission reopened the record for the purpose of collecting additional information pertinent to its analysis as to whether competition between subject imports and the domestic like product was limited by differences in products and/or customer types. *See Diamond Sawblades and Parts Thereof from China and Korea*, 73 Fed. Reg. 16910, 16911 (ITC March 31, 2008) (notice of remand proceedings). In consideration of that data and the court's remand instructions (and with the replacement of two of the original six commissioners) the ITC issued a new decision on May 14, 2008. In that decision, the Commission again found that the domestic industry was not materially injured by reason of subject imports, but reversed its position on the issue of threat-of-material-injury. *Remand Determination* at 1. That reversal was based, in part, upon its reversal on the issue of competition, where, according to the Commission, "the record leaves no doubt that there is considerable overlap in the mid-range sizes and that U.S.-, Chinese-, and Korean-produced finished diamond sawblades compete with each other in the same end-user markets and across a range of product sizes." *Remand Determination* at 16.

Respondents contend that the Remand Determination is erroneous because, *inter alia*, (1) the finding of substantial competition is unlawful and ignores substantial record evidence; (2) the threat determination is unsupported by substantial evidence and contrary to law; and (3) the Commission

improperly concluded that the analysis advocated in *Bratsk Aluminum Smelter v. United States*, 444 F.3d 1369 (Fed. Cir. 2006), does not apply to a threat determination. *St. Gobain Br.* at 5-7, 24; *Ehwa/Shinhan Br.* at 5, 10, 21. Respondents Ehwa and Shinhan argue separately that the ITC's decision to cumulate Korean and Chinese imports is contrary to law. *Ehwa/Shinhan Br.* at 3. Respondent St. Gobain contends that the findings of the Remand Determination are entitled to "considerably less deference" from the court because the ITC reversed itself from the prior decision. *St.Gobain Br.* at 2. For the reasons set forth below, the court will sustain the Remand Determination.

## II. Standard of Review

The Court must uphold the Commission's determination unless it finds that the determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (2000). The United States Court of Appeals for the Federal Circuit ("Federal Circuit") has stated that "in the hierarchy of the four most common standards of review, substantial evidence is the second most deferential, and can be translated roughly to mean is [the determination] unreasonable?" *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (internal citation and quotations omitted) (alteration in original).

The ITC's factual determinations are "presumed to be correct," and the burden of demonstrating otherwise rests upon the party challenging the determination. 28 U.S.C. § 2639(a)(1) (2000). Further, the Commission "is not required to explicitly address every piece of evidence presented by the parties, and absent a showing to the contrary, the ITC is presumed to have considered all of the evidence on the record." *Nucor Corp. v. United States*, 28 CIT 188, 234, 318 F. Supp. 2d 1207, 1247 (2004) (quotations and citation omitted) *aff'd*, 414 F.3d 1331 (Fed. Cir. 2005).

### III. Discussion

#### A. Deference Afforded to Agency Reversals

At the outset, Respondent St. Gobain suggests that the Commission's new decision is entitled to less deference from the court because it constitutes a reversal from a prior determination. St. Gobain points out that under the *INS v. Cardoza-Fonseca* line of cases, agency decisions that reverse prior decisions are "entitled to considerably less deference" from the Court. *St. Gobain Br*. at 2 (citing *INS v. Cardoza-Fonseca*, 480 U.S. 421, 446, n.30 (1987)); *Conf. Oral Arg. Tr.* at 7.

The court finds this argument meritless. The "deference" discussed in *Cardoza-Fonseca* refers to the deference afforded to an agency's interpretation of a statute, otherwise known as "Chevron deference." *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). A similar concept of deference is afforded to an agency's reasonable interpretation of its own regulations, particularly when that interpretation reflects an agency's longstanding policies or guidelines. *See Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735 (1996); *Gose v. U.S. Postal Svc.*, 451 F.3d 831 (Fed. Cir. 2006). That deference is substantially diminished, however, where an agency's interpretation of the statute or regulation at issue is inconsistent with its prior interpretations of the provision. *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 515 (1994).

Respondent's suggestion—that the policy of affording the agency "considerably less deference" should be applied to an agency's reversal on the outcome of a particular decision— cannot be accepted. Among other things, such a policy would be inconsistent with the purpose of this court's remand (which was based, in part, on a "substantial doubt whether the Commission would have made the same ultimate finding with the erroneous findings removed from the picture")

and contrary to the deference inherent in this Court's statutorily-mandated standard of review.  *See*

19 U.S.C. § 1516a(b)(1)(B).  Accordingly, the court must afford to the Commission the same

deference in the Remand Determination as that afforded to it in the Original Determination.

### B.  Competition Finding

As in the court's previous review, one of the principal points of controversy in this matter

concerns the Commission's competition finding.  Respondents now argue that the Remand

Determination's finding of "substantial competition throughout the market" is unsupported by

substantial evidence and contend that the finding of attenuated competition in the Original

Determination was correct.  *St. Gobain Br.* at 8; *Ehwa/Shinhan Br.* at 5.  Respondent St. Gobain

asserts that the ITC ignored evidence that the market is "highly segmented" between the "DIY[(do-it-

yourself)]/general contractor" (also referred to as "general use") market and the "professional"

market, and ignored evidence showing that the domestic industry sold only "professional"

sawblades, while the subject importers sold blades almost exclusively to the "DIY/general

contractor" market.  *St. Gobain Br.*  at 9.  Respondents assert further that the ITC ignored evidence

of attenuated competition based on channels of distribution and ignored that price differentials

between subject imports and domestic blades demonstrate that these are "two different products that

do not compete." *Ehwa/Shinhan Br.* at 6-7.  Although the respondents arguments are intertwined,

the court will address those arguments *seriatim.*

### 1.  Attenuated Competition based on Market Segmentation

Respondent St. Gobain first takes issue with the Commission's "summary reject[ion]" of its

contention that the diamond sawblade market is highly segmented into "professional" and

"DIY/general contractor" market segments. *St. Gobain Br.* at 9.  Respondent argues that the highly

segmented market severely attenuates competition because the domestic industry is almost

exclusively relegated to the "professional" market while the subject imports are similarly relegated

to the "DIY/general contractor" market. *Id.*

The court is unable to accept these arguments.  Although some evidence supports the

respondent's contentions, the Commission's decision to reject the "professional" vs. "DIY/general

contractor" dichotomy was not unreasonable and is supported by substantial evidence.  The

Commission discussed the problems with market segmentation based on these divisions in the

Remand Determination, where it noted:

> Although respondents contend that the U.S. diamond sawblade
> market is "highly segmented" into "professional-use" and "general
> use" categories, with larger-diameter blades often being used by the
> professional-use segment (by which they mean specialized concrete
> contractors), petitioners argue that there are no clear dividing lines.
> Respondents themselves were unable to define the professional-use
> market clearly, arguing during the preliminary phase investigations
> that size was an important factor in establishing a dividing line
> between "professional" and "general" use and then arguing during the
> final phase investigations that the dividing line was based on the
> horsepower of the saw in which the blade was used.  Contrary to
> respondents' argument, the record demonstrates an overlap in usage
> by "professional" concrete contractors, general contractors, and DIY
> end users, notably in the midrange-diameter category.

*Remand Determination* at 30 (Separate Views); *Remand Determination* at 5 (Views of the

Commission).

Substantial evidence supports the Commission's analysis.  As noted above, the Commission

rejected professional vs. general use market segmentation upon finding that the distinctions between

the proposed segments were unclear, and that, even where the distinctions were clear, the record

demonstrated a substantial overlap in usage, particularly in the midrange blades. Evidence of record supporting the Commission's findings falls into three categories: (1) evidence that the definition of a "professional" was not always clear; (2) evidence that the definition of a professional blade was changed as the investigation progressed; and (3) evidence that the domestic industry supplied blades to general contractors and that the subject imports supplied professional end users.

For example, in the Original Staff Report the ITC staff observed that "professional" sawblades were generally characterized as those that were (1) sold to "professionals," *i.e.*, end users in the road and commercial construction industry; (2) largely segmented and greater than 14" in diameter; and (3) "typically custom engineered for the industry." *ITC Staff Report*, Pub. R. Doc. 249 ("*Original Staff Report*") at I-10. However, evidence of record shows that this definition was quickly contradicted. *See Hearing Tr.* at 38-39 (Ms. O'Day) (stating that her definition of the term "professional[] . . . includes both general contractors and specialty contractors, plumbers, electricians, masons, construction contractors, refractory tile and marble installers, as well as concrete sawing and breaking specialists."); *id.* at 90 (Mr. Garrison (U.S. producer)) (testifying that custom blades were a "very small" (5-15%) portion of his business).

Further, that "professional" blades were defined as greater than 14" in diameter did not support the respondent's assertions regarding the "professional" focus of the domestic industry because data showed that the primary area of competitive overlap (and a substantial portion of the revenue of both the subject imports and the domestic industry) was in the midrange (10-14" diameter) blades. That is, according to the definitions of professional and DIY/general contractor blades provided above, a midrange sized sawblade would be categorized as a general contractor

blade. However if midrange blades are for general contractors and the domestic industry's largest percentage of revenue is from midrange blades, the claim that the domestic industry focuses almost exclusively on professional blades cannot be true.

Respondent asserts that the type of blade and the process by which it is manufactured further distinguishes professional from general use blades. However, as the court noted in its previous opinion on this matter, because a substantial majority of all sawblades sold in the U.S., regardless of source, were of the same type (segmented) and manufactured with the same process (laser welding), those factors are of little use as distinguishing characteristics.

Respondent then points to testimonial evidence indicating that the most relevant characteristic of a sawblade is the horsepower rating, and that only professional blades are designed for use on high-horsepower (greater than 35Hp) equipment. *See Hearing Tr.* at 307 (Mr. Nixon) ("We've chosen 35 horsepower as kind of the line in the sand that depicts the professional user."). The court finds this assertion unconvincing. Although there is little data in the record on the subject of horsepower ratings, where that information does exist— in the individual product comparisons— the data do not support the respondent's primary argument that the domestic industry was relegated to professional (when defined as high-horsepower) blades. For example, of the seven products compared, products 2, 3, 4, and 5 were mid-range (10-14" diameter) blades. Of those blades, only Product 5 was designated as high horsepower. Yet data show that subject import sales of Product 5 were almost equal to the domestic industry sales of Product 5. *See Original Staff Report* at V-37-39, Tables V-5a, V-5b, V-5c. Further, in products 2, 3, and 4, which were not high-horsepower blades, the domestic industry dominated almost every sales category. *Id.*

### 2. *Attenuation of Competition based on Channels of Distribution*

In the Original Determination the Commission found that competition was attenuated by channels of distribution based in part upon finding that the "distributors" channel (through which both the domestic industry and the subject importers sold the majority (by value) of their products) should be further subdivided into "branded" and "nonbranded" distributors as separate channels of distribution that did not compete with one another. Upon review, the court found that the Commission had failed to provide an adequate explanation as to the difference between a "branded" and "nonbranded" distributor, or how this division attenuated competition when evidence showed that both types of distributors served the same end user. Slip Op. 08-18 at 16-17.

In its new decision, the Commission reconsidered that finding in light of additional evidence obtained on remand (as well as evidence of record) and changed its position on this issue. As noted in the Remand Determination, the ITC found that, regardless of distributor type, "the products ultimately are purchased and used thereafter largely by the same types of end users," and thus essentially compete in the same market. *Remand Determination* at 7.

### a. Conflicting Evidence and the Remand Staff Report

Respondent St. Gobain argues that the Remand Determination is fatally flawed in this regard because the ITC ignored evidence showing that "branded" and "nonbranded" distributors were distinctly separate channels of distribution, and based its conclusion on "end-user information reported in a few distributor questionnaires." *St. Gobain Br.* at 12-13. St. Gobain contends further that, when the "self serving" responses of producer-purchasers were excluded, the remand questionnaire data showed that a substantial majority of firms believed that nonbranded and branded

distributors "seldom or never competed for business." *St. Gobain Br*. at 14 (citing to Table III-1 of the *Remand Staff Report*).

The Commission's determination that branded and nonbranded distributors compete is supported by substantial evidence. Data contained in the Original Staff Report show that both branded and nonbranded distributors (and one distributor self-defined as both) indicated "general contractors" as their primary customer. *Original Staff Report* at II-7. Similarly, as discussed below, additional questionnaire data presented in the Remand Staff Report may be reasonably interpreted to show competition. *See Remand Staff Report* at Table III-1.

The proper interpretation of information contained in the Remand Staff Report was a point of some contention in this matter. To illustrate, Table III-1, the interpretation of which the respondents challenge, is shown below.

**Table III-1**
**Diamond sawblades:  Competition between branded and unbranded distributors**

| Competition between branded and unbranded distributors | | | | | |
|---|---|---|---|---|---|
| | Number of purchaser responses | | | | |
| Diameter and purchaser group | A | F | S | N | O |
| ≤ 10 inches: | | | | | |
| All responding firms | 13 | 3 | 10 | 5 | 11 |
| Responding firms excluding responding DSB producers | 8 | 2 | 9 | 4 | 11 |
| Responding DSB producers | 5 | 1 | 1 | 1 | - |
| > 10 but ≤ 14 inches: | | | | | |
| All responding firms | 12 | 3 | 8 | 8 | 11 |
| Responding firms excluding responding DSB producers | 7 | 2 | 8 | 6 | 11 |
| Responding DSB producers | 5 | 1 | - | 2 | - |
| > 14 inches: | | | | | |
| All responding firms | 12 | 5 | 3 | 6 | 17 |
| Responding firms excluding responding DSB producers | 7 | 4 | 3 | 4 | 17 |
| Responding DSB producers | 5 | 1 | - | 2 | - |

Note.--A = Always, F = Frequently, S = Sometimes, N = Never, O = No familiarity.

Source:  Compiled from purchaser supplemental responses.

*Remand Staff Report*, Table III-1.

In its questionnaire, the Commission asked sawblade purchasers to indicate "the extent to which U.S. branded and unbranded distributors competed against each other" and derived table III-1 from the responses. *Remand Staff Report* at III-1. The Commission cited to Table III-1 in the Remand Determination as evidence that branded and nonbranded distributors compete, noting that "a substantial majority of all purchasers familiar with the issue . . . reported that branded and unbranded sawblades always, frequently, or sometimes competed in all size ranges." *Remand Determination* at 7, n.40. Conversely, respondent St. Gobain argues that the data above actually "show that the majority of firms with an opinion believed that branded and unbranded distributors seldom or never compete for business," and further that "when the self-serving responses of Petitioners are excluded the distinction is even more obvious, with 14 [questionnaire responders] reporting little or no competition and only nine reporting always or frequent competition." *St. Gobain Br.* at 14. Essentially, both respondents assert that the Commission's choice to include the "self-serving" responses of the producer-purchasers was error, and that the Commission's decision to group the "sometimes" responses together with the "always" and "frequently" responses was unreasonable. *St. Gobain Br.* at 14; *Ehwa/Shinhan Br.* at 9.

The court must reject these arguments. The respondents have pointed to no evidence impeaching the credibility of the producer-purchaser responses that would make the ITC's decision to include those responses unreasonable. Nor can the court conclude that it was unreasonable for the Commission to interpret a response that distributors "sometimes" compete as evidence of competition, as opposed to evidence of limited competition. The respondents are asking the court

to reweigh the evidence and to displace the agency's interpretation of that evidence with its own. This the court is not permitted to do. *See Universal Camera Corp. v. NRLB,* 340 U.S. 474, 488 (1951) (holding that the court may not "displace the [agency's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*."); *Usinor v. United States,* 28 CIT 1107, 342 F. Supp. 2d 1267, 1272 (2004). As this court has noted on many previous occasions, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 619-20 (1966), quoted in *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).

### b. Commission Practice

Respondents Ehwa and Shinhan object to the ITC's nonbranded/branded distributor analysis as "contrary to law" because it deviates from the Commission's "consistent practice when evaluating the extent of competition." *Ehwa/Shinhan Br.* at 6-7. According to the respondents, the Commission's consistent practice in this regard "is to examine the purchasers to whom U.S. producers and suppliers of subject imports first sell subject merchandise, and not the *customers* of those purchasers further down the distribution chain." *Id.* (emphasis in original).

The court is unable to find merit in this argument. The cases offered by the respondents do not support their contention either directly or by close analogy. The Commission practice (to which those cases refer) of "examin[ing] prices for the first arm[']s-length transaction in the U.S. market" relates to the pricing data used to determine whether underselling has occurred, not whether the products compete or whether distributors should be considered two separate channels of distribution.

*See Sodium Hexametaphosphate from China*, Inv. No. 731-TA-1110 (Final), ITC Publication 3984 (Mar. 2008), 2008 WL 1727622. Moreover, this court's remand was premised, in part, on the Commission's failure to provide an adequate explanation as to why "branded" and "nonbranded" distributors should be considered different channels of distribution, particularly in light of evidence suggesting that both distributor types served the same end user. Because the point of determining "the existence of common or similar channels of distribution" is ultimately to determine whether the subject imports compete with the domestic product, *Wieland Werke, AG v. United States*, 13 CIT 561, 563, 718 F. Supp. 50, 52 (1989), it was not unreasonable for the Commission to examine other customers in the distribution chain to make that determination.

### 3.  *Attenuated Competition and Price Effects Determination*

Respondent St. Gobain contends that the price-effects data "provide significant additional evidence that the Commission's competition analysis is inaccurate" because "the incredibly large price differential indicated that the products being compared were not the same." *St. Gobain Br.* at 18. Respondent also asserts that the Commission's price-depression finding itself is flawed in this regard because the Commission's price data do not reflect an "apples-to-apples," comparison; that is, "the imports are not underselling U.S. products but are actually lower-value/lower cost products that should not fairly be compared to the higher-quality domestic products." *Id.*

The court is unable to accept these arguments. The Remand Determination indicates that the Commission's price-effects findings were based on data generated from comparisons within seven individual diamond sawblade product groupings. The Commission requested information from the domestic industry and the subject importers as to selling price, number of units sold, customer type,

etc., for each of the specified products.  From that information the Commission derived various

findings (such as the degree of underselling) in regard to each product.  *See generally Original Staff*

*Report* at V-19-24; *see also Remand Determination* at 14.  A description of each product examined

is found in the Original Staff Report:

> Product 1.– 4" diameter laser-welded blades for dry cutting, 0.080" segment thickness, Premium grade blade (diamond impact strength within a TI/TTI range of 72-75 and diamond concentration in a range of 12-15 percent by volume of the segments or alternatively 0.55-0.65 carats/ccm);
>
> Product 2.– 12" diameter laser-welded blades for dry cutting, 0.110" segmented thickness, Premium grade blade (diamond impact strength within a TI/TTI range of 82-85 and diamond concentration in a range of 17-20 percent by volume of the segments or alternatively 0.75-0.85 carats/ccm) for use in high speed saws of 5,000 rpm or more;
>
> Product 3.– 14" diameter laser-welded blades for dry cutting, 0.110" segment thickness, Premium grade blade (diamond impact strength within a TI/TTI range of 82-85 and diamond concentration in a range of 17-20 percent by volume of the segments or alternatively 0.75-0.85 carats/ccm) for use in high speed saws of 5,000 rpm or more;
>
> Product 4.– 14" diameter laser-welded blades for dry cutting, 0.125" segment thickness, Premium grade blade (diamond impact strength within a TI/TTI range of 82-85 and diamond concentration in a range of 17-20 percent by volume of the segments or alternatively 0.75-0.85 carats/ccm) for use in high speed saws of 5,000 rpm or more;
>
> Product 5.– 14" diameter laser-welded blades for wet cutting cured concrete, 0.125" segmented thickness, Premium grade blade (diamond impact strength within a TI/TTI range of 74-77 and diamond concentration in a range of 33-35 percent by volume of the segments or alternatively 1.45-1.55 carats/ccm) for use in saws of 35 hp or more;
>
> Product 6.– 18" diameter laser-welded blades for wet cutting cured concrete, 0.125" segment thickness, Premium grade blade (diamond impact strength within a TI/TTI range of 74-77 and diamond concentration in a range of 33-35 percent by volume of the segments or alternatively 1.45-1.55 carats/ccm) for use in saws of 35 hp or more; and
>
> Product 7.– 24" diameter laser-welded blades for wet cutting cured concrete, 0.155" segment thickness, Premium grade blade (diamond impact strength within a TI/TTI range of 74-77 and diamond concentration in a range of 33-35 percent by volume of the segments or alternatively 1.45-1.55 carats/ccm) for use in saws of 35 hp or more.

*Original Staff Report* at V-19.  The data shown above do not indicate, as the respondents assert, that

the Commission's price-effects determination was based on an "apples to oranges" comparison.

Within each product type, the products compared appear to have been identical in terms of diameter, type, manufacturing process, segment thickness, grade and concentration of diamonds, and horsepower rating. If these are different products, the respondents have failed to explain what those differences are. Accordingly, the respondent's assertions must be rejected.

### C. Threat Finding Arguments

Respondents assert that the Commission's threat finding is unsupported by substantial evidence and contrary to law. Respondents contend, *inter alia*, that (1) that the robust condition of the domestic industry does not square with the Commission's finding that the domestic industry is threatened with material injury; (2) the Commission's finding of "flattening" demand is contradicted by substantial record evidence; and (3) that the Commission's finding that subject imports can "service the professional construction sector" is unsupported by substantial evidence. *Ehwa/Shinhan Br*. at 11- 12, 17; *St. Gobain Br*. at 19, 20.

The crux of the Commission's finding is that the domestic industry was only able to remain profitable (though the profits declined) because of the dramatic increases in demand for diamond sawblades during the period of investigation ("POI"). However, the Commission reasoned, because demand was expected to "flatten" and the subject imports were expected to continue to increase, nothing would save the domestic industry from material injury. The Commission explained:

> The domestic industry's ability to maintain profitability was attributable in large part to the high and increasing demand during the POI. Despite this favorable circumstance, as well as the success of a number of domestic producers in reducing their costs of production through increased productivity, reductions in employment, and investment in upgraded equipment, the industry's operating income and operating income margin declined during the POI, as prices fell and material costs rose. We note that various domestic industry

> representatives testified that cost and efficiency improvements have reached a limit and are not expected to have additional impact on the industry going forward. Now that demand is likely to flatten and low-priced subject imports are likely to continue to increase in the imminent future, the increasing volumes of imports will cause prices to decline further absent antidumping relief. These import increases and price declines will likely accelerate the loss of operating income, leading to material injury to the domestic industry.

*Remand Determination* at 23.

Substantial evidence of record supports the Commission's findings. It is undisputed that demand for diamond sawblades dramatically increased during the POI, regardless of market segment. The record also shows that, in spite of the increased demand, several indicators of the domestic industry's performance trended downward. The domestic industry's market share for finished diamond sawblades fell (by value) from [     ]% in 2003 to [     ]% in 2005; aggregate operating income fell a total of [     ]% during the POI, as did the domestic industry's aggregate operating income margins (falling [     ]%) and aggregate return on assets (falling [     ]%). Moreover, as noted below, evidence supports a finding of flattening demand and increasing subject imports. Accordingly, the court must find that the Commission's conclusion is supported by substantial evidence and is not unreasonable.

Respondents take issue with the fact that the ITC's "flattening" demand finding was based on questionnaire responses stating that demand for finished sawblades *would not change* in the future. According to the respondents, "these responses indicate simply that demand would continue to remain high and at strong levels," and were not indicative of threat. *Ehwa/Shinhan Br*. at 11; *see also St. Gobain Br*. at 20. Respondents assert further that the ITC ignored evidence showing that demand would *increase* in the future, such as testimony regarding the passage of a highway bill that

would generate demand for professional cutting blades, and further demand generated by Hurricane Katrina rebuilding efforts. *Ehwa/Shinhan Br.* at 11, *St. Gobain Br.* at 21.

The court finds no merit in these arguments. First, whether demand is high or low is unrelated to whether that demand is increasing, decreasing, or flat. Evidence of record shows that the majority of U.S. producers, the majority of U.S. importers, and the majority of other U.S. purchasers all reported that they did not expect demand to change in the future; a minority expected demand to increase or decrease. *Original Staff Report* at II-37. Hence, the Commission's finding of "flattening demand" is supported by substantial evidence. Second, the Commission is presumed to have considered all of the evidence before it. Although some evidence may be deemed to be of such relevance that the failure to address it may require remand, *Altx Inc., v. United States*, 25 CIT 1100, 1117-18, 167 F. Supp. 2d 1353, 1374 (2001) (holding that the ITC must address evidence that "seriously undermines its reasoning and conclusions"), testimony as to the potential effects of future highway funds hardly rises to that level. Moreover, it appears that passage of the Highway Bill was indeed factored into the Commission's finding because, as noted in the Original Staff Report, the firms that were expecting an increase in demand noted "more federal funds for highways and bridges" as one of the reasons for that expectation. *Original Staff Report* at II-37. Accordingly, the Commission's determination in this regard is adequately explained and supported by substantial evidence.

Respondents Ehwa and Shinhan next attack the Commission's finding regarding the respondents' ability to "service the professional construction sector," and assert that the Commission "cite[d] no evidence that imports will begin shifting to the larger-sized [blades] sold directly or

indirectly to professional end users." *Ehwa/Shinhan Br.* at 12-13. Respondents argue further that

subject imports of the larger-sized blades increased "[          ], by [          ]" during the POI

and that substantial evidence indicates that foreign producers were not able to service professional

construction users from abroad. *Id*.

 The finding to which the respondents apparently refer is found in the Remand Determination

at pages 22-23, where the Commission stated:

> Contrary to the respondents arguments, no portion of the market, as
> defined by size or end-user category, is sheltered from competition
> with the subject imports. Cumulated subject import sales are
> increasing in each size range, including the larger sizes in which
> professional customers that may require post-sale customer service
> dominate.

*Remand Determination* at 22-23. The Commission's finding that subject importers had the ability

to infiltrate the larger-sized "professional" sawblades sector[1] is supported by substantial evidence.

Although the respondents characterize the subject imports' increase in large-blade sales as "[     ],"

data in the record indicates that the [                                        ]. *See Original Staff Report*

at Table IV-4. The respondents essentially attack the substantiality of the Commission's findings

by offering their own interpretation of the evidence in support of an alternate conclusion. As to the

specific issue of "post-sale customer service," the Commission noted evidence showing that "some,

but not all sales to professional concrete contractors may require customization, quick turnaround,

or onsite customer service," and that even where such service was required, evidence suggested that

subject importers were not precluded from entering the market because of their ability to "provide

overnight shipping" and/or "service through their U.S. sales affiliates," or service through U.S.

---

[1] In this instance, the parties are referring to diamond sawblades greater than 20" in diameter.

distributors.  *Remand Determination* at 23 n.141.  Accordingly, the court must conclude that the

Commission's findings in this regard are not unreasonable and are supported by substantial evidence.

As noted above, it is not the function of the court to "reweigh the evidence or substitute its own

judgment for that of the agency." *Usinor*, 342 F. Supp. 2d at 1272.

D. Cumulation Argument

Respondents Ehwa and Shinhan assert that the ITC's decision to cumulate subject imports

in its threat analysis is unsupported by substantial evidence.  Specifically, the respondents argue that

there were significant disparities between Korean and Chinese imports' pricing and volume trends

during the POI, and that "ITC will not cumulate subject imports if, as here, subject imports are

[                                                                                              ]."

*Ehwa/Shinhan Br.* at 3.

The statute provides, in pertinent part:

**(H) Cumulation for determining threat of material injury**

> To the extent practicable . . . for the purposes of clause (i)(III)
> and (IV) of subparagraph (F) the Commission may cumulatively
> assess the volume and price effects of imports of the subject
> merchandise from all countries . . . if such imports compete with each
> other and with domestic like products in the United States market.

19 U.S.C. § 1677(7)(H) (2000).

Respondents appear to argue that the statute's inclusion of the permissive "may," together

with this Court's history of upholding ITC decisions *not* to cumulate imports where a "great

disparity" in patterns of volume or underselling existed, amounts to a mandate that the Commission

"may not" cumulate imports if the patterns of volume or underselling are "substantially" different.

*Ehwa/Shinhan Br.* at 4 (citing *Torrington v. United States*, 16 CIT 220, 229-30, 790 F. Supp. 1161, 1172 (1992).

The court does not agree. The decision as to whether cumulation is appropriate in a threat case is discretionary. If the imports at issue meet the ministerial requirements of section 1677(7)(H) and "compete with each other and with the domestic like products," the Commission may cumulate if it finds it "practicable" to do so. The legislative history of the cumulation statute reveals that the threat provision was made discretionary because Congress recognized "the difficulty of applying the concept of cumulation to threat cases, and [did] not seek to require cumulation where it is impracticable to do so because such assessment would be conjectural or speculative." H.R. Rep. No. 100-40, pt. 1, at 131 (1987). Hence, where this Court has sustained the ITC's decisions to not cumulate in threat cases, it has done so in the spirit of deference to the ITC, requiring only that the Commission's decision be adequately explained, reasonable, and supported by substantial evidence. *See Asociacion Colombiana de Exportadores de Flores v. United States*, 12 CIT 1174, 1178, 704 F. Supp. 1068, 1072 (1988) (cited by *Torrington, supra*).

In this case, the Commission's decision to cumulate was not unreasonable. During the POI, Korean imports increased [    ] percent (by value) and Chinese imports increased [    ] percent; Korean imports undersold domestic sawblades in 189 of 245 comparisons at margins ranging up to 80.8 percent, while Chinese imports undersold domestic sawblades in 112 of 115 comparisons at margins ranging as high as 84.4 percent. *Remand Determination* at 14; *Original Staff Report* at V-62, Table V9c. Although these data reflect differences in the rate of increase and degree of underselling, those differences are insufficient to render unreasonable the ITC's decision to

cumulate, or that cumulation was "practicable" under the circumstances. Accordingly the court must sustain the ITC's decision to cumulate the subject imports.

### E. *Bratsk* Analysis

Finally, Respondents contend that the Commission's failure to apply the *Bratsk* test was error and requires remand. *E.g., Ehwa/Shinhan Br.* at 21, 23 (*citing Bratsk Aluminum Smelter v. United States*, 444 F.3d 1369 (Fed. Cir. 2006)). Respondents contend that "[u]nder *Bratsk* the ITC is required to determine if third-country imports will, in part, replace subject imports," and that a proper application of the *Bratsk* test in this case "produces startling results." *Id*. These "startling results," according to the respondents, would show that [

] and that [

]. Respondents contend that, because the ITC failed to perform the analysis mandated by *Bratsk,* the ITC failed to take into account the increasing non-subject imports "which strongly indicates that subject imports do not threaten injury to the U.S. domestic injury because non-subject imports could 'replace' them." *Ehwa/Shinhan Br*. at 24.

The ITC contends that because *Bratsk* and its holdings were made in the context of a present material injury finding, there is no clear mandate from the Federal Circuit that such an analysis is required where only threat of material injury is at issue. *ITC Br.* at 21. Additionally, the ITC asserted at oral argument that the respondents never presented the *Bratsk* argument to the Commission, and, accordingly, had failed to exhaust administrative remedies on this issue. *Conf. Oral Arg. Tr.* at 48. For the reasons set forth below, the court agrees.

In *Mittal Steel*, the Federal Circuit clarified that the inquiry required by *Bratsk*

> is *not concerned* with whether an antidumping order would actually
> lead to the elimination of those goods from the market in the future
> or whether those goods would be replaced by goods from other
> sources. Rather, the inquiry is a hypothetical one that sheds light on
> *whether the injury to the domestic industry can reasonably be*
> *attributed to the subject imports.* The focus of the inquiry is on the
> cause of injury in the past, not the prospect of effectiveness in the
> future.

*Mittal Steel*, 542 F3d at 876 (emphasis added).  According to *Mittal Steel*, *Bratsk* essentially calls

for a "but-for"causation test when certain "triggering" factors are present:  When the ITC's inquiry

"is centered on a commodity product, and price competitive non-subject imports are a significant

factor in the market," the Commission is required "to explain why . . . it concluded that the subject

imports caused material injury to the domestic industry." *Id.* at 1375.  In essence, *Mittal Steel*

clarified that a *Bratsk* analysis is a method of assessing of whether the injury suffered by the

domestic industry was "by reason of" the subject imports and *not* "by reason of" nonsubject imports.

Accordingly, the court must reject as incorrect the respondents' interpretation of *Bratsk* as

requiring an analysis as to the potential beneficiaries of an antidumping order.  In other words,

Respondents' assertions as to the "startling results" that would ensue in the wake of antidumping

duties are not part of the causation analysis directed by *Mittal Steel*, but part of the "whether goods

would be replaced by other sources" question that *Mittal Steel* expressly rejected.  As to the

argument of whether *Bratsk* must be applied to a threat analysis, the court finds that, for the reasons

stated below, it is unnecessary to decide that issue here.

Administrative exhaustion of remedies is generally required before a litigant will be allowed

to raise a claim via a civil action. *See* 28 U.S.C. § 2637(d) (2000); *Sharp Corp. v. United States*,

837 F.2d 1058, 1062 (Fed. Cir. 1988). A reviewing court usurps the agency's function when it sets

aside a determination upon a ground not previously presented and deprives the agency of an

opportunity to consider the matter, make its ruling, and state the reasons for its action. *United States*

*v. L.A. Tucker Truck Lines, Inc*., 344 U.S. 33, 37 (1952).

At oral argument the respondent asserted that the requirement of administrative exhaustion

of remedies should not apply in this matter because there was no opportunity to raise *Bratsk* at an

earlier time. Respondent contends that the question "didn't become a germane and live issue until

the Commission on remand issued its threat finding for the first time in the history of this

proceeding." *Conf. Oral Arg. Tr.* at 51. The court cannot agree. As noted above, *Mittal Steel*

clarified that a *Bratsk* analysis is part of a causation analysis. The issue of causation has been a

"germane and live issue" since the beginning of the investigation, and at no point in the investigation

did the respondents assert that nonsubject imports played any causal role in the condition of the

domestic industry. Accordingly, the court will decline to address this argument.

## F. Plaintiff's Request for Relief

Plaintiff DSMC requests that, should the court choose to affirm the Remand Determination,

the court (1) direct the ITC to "transmit its remand decision to [the Department of] Commerce and

to publish notice of the decision in the Federal Register" as required by law, (2) direct the

Department of Commerce "to publish notice of this court's affirmation of the ITC's final remand

decision in the Federal Register," and (3) to "order the suspension of liquidation and collection of

cash deposits." *Pl's. Br.* at 22-23. DSMC contends that this additional action is necessary "to

provide effective relief" in this matter because, although the actions it requests the court to mandate

are required by law, "the agencies have, in other cases, delayed such actions until all appeals are exhausted." *Id.* at 21.

Because the plaintiff's prayer for relief requires the court to take the additional steps of ordering the ITC and Commerce to complete the specific actions listed above, the court will construe the request as a petition for a writ of mandamus. *See Decca Hospitality Furnishings, LLC v. United States*, 30 CIT 357, 363-64, 427 F. Supp. 2d 1249, 1255 (2006).

The common-law writ of mandamus, as codified in 28 U. S. C. §§ 1361, 1651(a) (2000) is a drastic remedy, "to be invoked only in extraordinary situations." *Kerr v. U. S. Dist. Ct. N.D. Cal.*, 426 U.S. 394, 402 (1976). Because a writ of mandamus is "one of the most potent weapons in the judicial arsenal," *Cheney v. United States Dist. Court for D.C.*, 542 U.S. 367, 380 (2004), three conditions must be met before the court may issue a writ: First, the party seeking issuance of the writ must demonstrate that he lacks adequate alternative means to obtain the desired relief; second, the petitioner must demonstrate a clear and indisputable right to the writ; and third, "even if the first two prerequisites have been met, the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances." *Cheney*, 542 U.S. at 380-81.

The court is unable to find that a writ of mandamus is appropriate at this time. The plaintiff's request is based upon speculation that the ITC and Department of Commerce may, in the future, fail to perform duties required by law. However, at the present time, the standard operation of the law provides to the plaintiff an adequate means to attain the desired relief. Accordingly, the plaintiff's request must be denied.

The court has considered the parties other arguments and finds them without merit.

**IV.  Conclusion**

Upon consideration of the foregoing, the court finds that the Commission's Remand Determination is not unreasonable and is supported by substantial evidence.  Accordingly, the court will sustain the Remand Determination in its entirety.  Judgment will be entered accordingly.


　　　　　　　　　　　　　　　　    /s/   R. Kenton Musgrave
　　　　　　　　　　　　　　    R. KENTON MUSGRAVE, Senior Judge

Dated: January 13, 2009
　　　　 New York, New York

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| DIAMOND SAWBLADES MANUFACTURERS COALITION, | : | |
| Plaintiff, | : | |
| v. | : | Before: **MUSGRAVE, Senior Judge** |
| | : | Court No. 06-00247 |
| UNITED STATES, | : | |
| Defendant, | : | |
| and | : | |
| ST. GOBAIN ABRASIVES, INC., EHWA DIAMOND INDUSTRIAL CO., LTD., and SHINHAN DIAMOND INDUS. CO., LTD., | : | |
| Defendant-Intervenors. | : | |

## JUDGMENT

This action having been submitted for decision, and the Court, after due deliberation and consideration of all papers and proceedings, having rendered a decision herein; now, therefore in conformity with said decision, it is hereby

**ORDERED, ADJUDGED AND DECREED** that the remand determination of the U.S. International Trade Commission in *Diamond Sawblades and Parts Thereof from China and Korea*, Investigation Nos. 731-TA-1092 and 1093 (Final) (Remand), USITC Pub. 4007 (May 2008) is sustained in its entirety.

/s/ R. Kenton Musgrave
R. KENTON MUSGRAVE, Senior Judge

Dated: January 13, 2009
New York, New York

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____      By: _____
                                              Deputy Clerk